154

# CIRCUIT COURT OF LOUDOUN COUNTY

Amica Mutual Ins. Co.

v.

Liberty Mutual Fire Ins. Co.

October 13, 2006

Case No. (Chancery) 24581

BY JUDGE JAMES H. CHAMBLIN

After consideration of the evidence, the argument of counsel at trial, and all the memoranda, and for the reasons stated below, I find that the Plaintiff, Amica Mutual Insurance Company (Amica), voluntarily paid the personal injury claim of Thomas Langan against its insured, Karen Burke. As a result, Amica, whose policy provided excess coverage, is not entitled to recover payment from the Defendant, Liberty Mutual Fire Insurance Company (Liberty Mutual), whose policy provided primary coverage. Amica's Amended Motion for Judgment is dismissed with prejudice.

*Facts*

On October 2, 2002, Thomas Langan was injured in a golf cart accident at River Creek Country Club in Leesburg, Virginia. Mr. Langan was struck by a golf cart driven negligently by Karen Burke. Mr. Langan was not contributorily negligent.

As a result of the accident, Mr. Langan suffered a broken left leg and some less serious injury to his right leg. Ms. Burke's negligence was the sole proximate cause of Mr. Langan's injuries.

Mr. Langan underwent surgery on his left leg on December 2, 2002, during which a plate and screws were inserted to help heal the fracture. Mr.

Langan's medical bills resulting from the accident total $19,761.03. The bills are reasonable and necessary. They were caused by Ms. Burke's negligence.

At the time of the accident, Ms. Burke was the named insured in an automobile insurance policy issued by Amica. This policy provided excess coverage of $250,000.00 because Ms. Burke was operating a vehicle she did not own. Ms. Burke also had a homeowner's policy with Amica that provided additional excess coverage of $300,000.00 over any other primary insurance coverage. She notified Amica of the accident the day it occurred. Amica began its investigation within a few days. Mr. Langan and Ms. Burke were interviewed by an Amica adjuster on October 7, 2002.

Also, at the time of the accident, the Defendant, Liberty Mutual Fire Insurance Company (Liberty Mutual) provided primary insurance coverage for the accident through a policy of general liability insurance issued to Club Corp., Inc., the parent company to River Creek Country Club (River Creek). River Creek is an additional insured under the Liberty Mutual policy.

After being notified of the accident, Amica investigated it and followed up with Mr. Langan, securing a great deal of information about his medical care and recovery from the injuries he sustained. See Joint Exhibit 2 (Amica's claim file).

As early as March 2003, Amica had information that Liberty Mutual may have primary coverage for the accident and realized the need to "follow up" with Liberty Mutual "for contribution." See Alexander Memo to File dated March 3, 2003 (Joint Exhibit 2 – 00109). By March 3, 2003, Amica knew that Liberty Mutual insured River Creek, but it did not know if Liberty Mutual had issued a policy that would have actually covered Mr. Langan's claim.

Ann Alexander, an adjuster for Amica, sent three letters to Liberty Mutual concerning Mr. Langan's claim arising out of the accident. The three letters, dated March 3, 2003 (Joint Exhibit 2 – 000105), April 1, 2003 (Joint Exhibit 2 – 000116), and June 19, 2003 (Joint Exhibit 2 – 000130) are all addressed to Liberty Mutual's proper address in Irving, Texas. Each letter refers to the date and location of the accident, at River Creek. Each letter was on Amica letterhead with an address and telephone number for Amica. However, each letter was not addressed to a specific person at Liberty Mutual. The last two letters requested a copy of Liberty Mutual's liability policy for River Creek. Each of the three aforesaid letters was properly addressed and stamped. The presumption of receipt (see, e.g., *Manassas Park Devel. Co. v. Offutt*, 203 Va. 382, 385 (1962)) has not been rebutted. Liberty Mutual received each letter.

Liberty Mutual did not respond to the letters, except for a voice mail message from "Mark at Liberty Mutual" to Ms. Alexander. She called back and left a message for "Mark," but did not receive a call back. See Ms. Alexander's "File Review" dated July 22, 2003, Joint Exhibit 2 – 000164. "Mark" was probably Mark Walling who testified at trial, but he testified that he had no recollection of the call and made no note of it.

Mr. Walling explained the procedure for letters coming to Liberty Mutual not addressed to a specific person. Its procedure was for someone to contact the letter's author if no claim file had been made up yet for the claim. Liberty Mutual did not open a claim file for this claim until April 2004, after this litigation commenced.

By May 2003, Amica was advised by Mr. Langan that he had resumed his normal activities. See Ms. Alexander's memo dated May 14, 2003, Joint Exhibit 2 – 000125.

On June 19, 2003, Amica received a copy of the lease agreement between Textron Financial Corporation and River Creek for the golf cart involved in the accident. See Joint Exhibit 2 – 000131-138. The lease requires River Creek to maintain liability insurance of $1,000,000.00 covering the golf carts.

On June 27, 2003, Mr. Langan faxed to Ann Alexander a spreadsheet showing the medical expenses he incurred as a result of the accident. See Joint Exhibit 1 – 000038-48. These expenses are very close to the expenses which Amica claims Mr. Langan claimed in its Answer to Interrogatories. See Joint Exhibit 4, Answer to Interrogatory 11.

On July 8, 2003, Amica received a copy of a Certificate of Liability Insurance showing that River Creek through Club Corp. had commercial general liability coverage through Liberty Mutual with a limit of $1,000,000.00 for each occurrence.

Without advising Liberty Mutual, Amica on August 28, 2003, settled Mr. Langan's claim. See Settlement Agreement and Release dated August 28, 2003, Joint Exhibit 2 – 000178-182. The settlement was for $45,000.00 in cash plus an annuity paying $750.36 per month for twelve years. The settlement had a present value of $140,000.00. Based on the policy number recited in the Settlement Agreement, the policy providing coverage at the settlement is Ms. Burke's automobile policy. See Joint Exhibit 2 - 000001 and 000178.

At no time was Mr. Langan represented by counsel as to his claim.

The claims supervisor for Amica who decided to settle the claim testified that he settled it because Mr. Langan was considering retaining counsel (when an attorney gets involved the value goes up 33%), he had an

objective injury ("hardware" in the leg) that could cause problems in the future, he was making no lost wage claim, and, foremost, Amica needed to protect its insured, Ms. Burke.

Despite being advised by counsel that the "safest route" was to file a declaratory judgment action to determine availability and priority of coverage, Amica never did so. Amica never filed a declaratory judgment action before settling with Mr. Langan.

Amica never received a copy of Liberty Mutual's liability policy for River Creek before Amica settled with Mr. Langan. Amica always knew that it would have no duty to defend or settle Mr. Langan's claim if there was other primary insurance. At no time did Amica ever believe that Mr. Langan would obtain a jury verdict in excess of its policy limits. Liberty Mutual never denied coverage or refused to defend.

The conflicting testimony of Taylor Quarles, who was Amica's claims supervisor at the time of settlement with Mr. Langan, as to what he knew about Liberty Mutual providing primary coverage is discussed in the Legal Conclusions portion of this opinion letter.

*Legal Conclusions*

Counsel consider this case as one involving equitable subrogation, yet, interestingly enough, the case relied upon by both parties, *Williams v. Consolvo*, 237 Va. 608 (1989), does not mention equitable subrogation. The general rule which counsel feel applies is stated in *Williams* as follows:

> In *Wessel, D. & Co. v. Winborne & Co.*, 125 Va. 502, 510, 99 S.E. 719, 721 (1919), we wrote as follows:
>
> *Where a person with full knowledge of the facts voluntarily pays a demand unjustly made* upon him, though attempted or threatened to be enforced by proceedings, it will not be considered as paid by compulsion, and *the party thus paying is not entitled to recover back the money paid,* though he may have protested against the unfounded claim at the time of payment made. Where money has been paid under a mistake of the facts, or under circumstances of fraud or extortion, or as a necessary means to obtain the possession of goods wrongfully withheld from the party paying the money, an action may be maintained for the money wrongfully exacted. But *such action is not maintainable in the naked case of a party making a payment of a demand rather than resort to litigation,* and under the

supposition that the claim which subsequently turned out to be unauthorized by law, was enforceable against him or his property.

(Emphasis added.) *Accord · Virginia Brewing Co. v. Commonwealth,* 113 Va. 145, 148, 73 S.E. 454, 456 (1912). *See Newton v. Newton,* 202 Va. 515, 520, 118 S.E.2d 656, 659 (1961); *Southern Biscuit Co. v. Lloyd,* 174 Va. 299, 314, 6 S.E.2d 601, 607 (1940). In *Newton,* we explained that "[a] mistake of law which precludes a recovery occurs when a person, with full knowledge of the facts, comes to an erroneous conclusion as to their legal effect."

202 Va. at 520, 118 S.E.2d at 659.

It is a rule concerning payment by a volunteer, which is not exactly equitable subrogation. Amica contends that it does not fit the definition of a volunteer under *Williams,* and, hence, it is entitled to recover from Liberty Mutual the amount it paid to settle Mr. Langan's claim.

Liberty Mutual contends that Amica voluntarily paid Mr. Langan, and, as a volunteer, it is not entitled to recover from Liberty Mutual the amount Amica paid to settle Mr. Langan's claim.

The parties have narrowed the issue to whether Amica had "full knowledge of the facts" when it settled with Mr. Langan.

Amica argues that it did not have full knowledge of the facts because Liberty Mutual failed to respond to the requests of Amica for a copy of Liberty Mutual's policy. Amica, therefore, feels it was not a volunteer.

On the other hand, Liberty Mutual argues that Amica had knowledge that Liberty Mutual's policy provided primary coverage when it settled with Mr. Langan.

Initially, I need to address the issue of the conflicting testimony of Taylor Quarles, the Amica claims supervisor who authorized the settlement, at his deposition and at trial. In the portions of Mr. Quarles' deposition read into evidence at trial, he admitted:

(1) That, at the time of the settlement, Amica knew that River Creek had a policy of insurance in effect which included primary coverage for personal injury claims arising from accidents on River Creek's property; and

(2) That there was in effect a general liability policy that covered Mr. Langan's accident.

In other parts of his deposition testimony and at trial Mr. Quarles definitely stated that, at the time of settlement, Amica did not know whether Liberty Mutual had in effect a policy of liability insurance providing primary coverage for Mr. Langan's accident and his personal injury. Mr. Quarles so testified because he did not have at the time of the settlement a copy of Liberty Mutual's policy.

In fairness to Mr. Quarles and considering the way in which the questions were posed to him at his deposition, I decline to construe his deposition answers as constituting an admission by Amica that it knew at the time of the settlement that Liberty Mutual's policy afforded primary coverage.

Amica misconstrues the "with full knowledge of the facts" element of the voluntary payment rule set forth in *Williams*. Amica seems to feel that if there is just one fact that it did not know, then it cannot be a volunteer. Put another way, I think that Amica's position is that "with full knowledge of the facts" means "with full knowledge of *all* the facts." (Emphasis mine.) I do not agree with Amica's argument.

Because the volunteer payment rule is one of equity, I think that the "with full knowledge of the facts" element requires that a person have knowledge of enough facts to make him a volunteer. This would not require knowledge of absolutely every fact in order to be considered a volunteer.

The volunteer payment rule does not contemplate that a volunteer would have knowledge of all the facts. If such a person did have knowledge of all the facts, then he would have been able to determine that the demand on him was unjustly made and he would not have paid in the first place.

Amica argues that, despite knowing all the things of which it was aware (as set forth in the Statement of Facts), it still did not have knowledge of the facts needed to prevent it from being considered a volunteer because it did not have one thing, a copy of Liberty Mutual's policy.

Amica offered no evidence that it would not have paid even if it had seen Liberty Mutual's policy prior to settling with Mr. Langan. Amica offered no evidence that it would have come to the conclusion after examining Liberty Mutual's policy that it provided primary coverage.

From the facts known by Amica before it settled with Mr. Langan, it should have known, or a reasonable insurer should have known, that Liberty Mutual had the primary coverage, and, therefore, there would be no legal obligation on Amica as the excess carrier to cover the accident. Yet Amica went ahead and settled with Mr. Langan. Amica made a calculated decision. While Amica says the industry correct thing, that it had a duty to protect its insured, Amica settled because they felt they got a settlement favorable to it from a non-represented claimant. Amica certainly recognized that a claim

usually increases when an attorney becomes involved. Amica also feared future problems for Mr. Langan because of the plate and screws needed to fix the fracture.

Amica made a business decision. It had the opportunity to settle, avoid the possibility of a larger claim if Mr. Langan "lawyered up" and/or had future problems, and then see if thereafter Liberty Mutual, or any other insurer, might contribute to the settlement. This was all done in light of the possibility that Amica might end up being the only provider of any coverage.

Amica could have assured itself of being only an excess carrier by filing a declaratory judgment action. It was well aware of this course of action. Amica's counsel saw it as the "safest route." But Amica chose to settle without filing a declaratory judgment action.

Amica, citing *Criterion Ins. Co. v. Fulgham*, 219 Va. 294 (1978), argues that it would be an inequitable result in this case to follow the voluntary payment rule. *Criterion* does not apply because it did not involve an attempt to recover after the payment of funds.

Amica cannot argue that it settled with Mr. Langan because it was threatened with the immediate loss of its money. See, e.g., *Lamont v. Seabury*, 64 Va. Cir. 243 (Fairfax 2004). Mr. Langan never filed suit against Ms. Burke.

Finally, Amica argues that Liberty Mutual would be unjustly enriched if the voluntary payment rule is applied mechanically in this case. I do not agree. For Liberty Mutual to be unjustly enriched, it would have to have been obligated to pay what Amica paid to settle Mr. Langan's claim. I do not believe that a liability carrier has a duty to settle. No one made a claim with Liberty Mutual. Amica had no right to make a claim under Liberty Mutual's policy.

Liberty Mutual insured River Creek. This coverage protected River Creek for claims against it, and, possibly the owner of the golf cart. There is no evidence that Mr. Langan ever made a claim against River Creek or the golf cart owner.

Amica for its own reasons (explained above) decided to settle as if its policy provided primary coverage. Amica had the ability to determine if Liberty Mutual's policy was primary by filing a declaratory judgment proceeding. Amica chose not to do so. It ran the risk of Liberty Mutual not voluntarily agreeing to contribute to the settlement. It was a business decision for Amica, either settle what Amica's counsel calls a "loser case" for the smallest amount that "unlawyered up" Mr. Langan would accept or take the "safest route" as suggested by its counsel and file a declaratory judgment action, which could take time and might lead to the distinct possibility that the

amount Amica would have to pay may increase because, for example, Mr. Langan had future problems due to his "hardware" and/or getting an attorney. The equities do not favor Amica under these circumstances.

There is no need to consider the issue of whether it was reasonable for Amica to have settled with Mr. Langan for the amount it did.